**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

SPIRO MENEGATOS and          :
STEVEN MENEGATOS,            :
                             :
      Plaintiffs,         :
                             :         Civil Case No. 1:26-cv-78
   v.                      :
                             :         **COMPLAINT**
STEFANOS EVANGELINOS,        :
                             :
      Defendant.          :
                             :

--------------------------------------------------------------x

     Plaintiffs Spiro Menegatos ("Spiro") and Steven Menegatos ("Steven") (collectively "Plaintiffs"), by and through their attorneys, DGW Kramer LLP, for their Complaint against Defendant Stefanos Evangelinos ("Defendant" or "Stefanos"), allege as follows:

## INTRODUCTION

     1.     This action arises from Defendant Stefanos Evangelinos's deliberate, multi-year scheme to conceal a written Shareholders Agreement governing the disposition of shares in New Yorker Wholesale Bagels, Inc. ("NYWB") upon the death of his longtime partner, George Menegatos ("George"), while falsely representing to George's family, the Estate, and valuation professionals that no such agreement existed.

     2.     For decades, George and Defendant were equal partners in NYWB. Their relationship extended far beyond business. Their families were intertwined across generations, bound by shared history, mutual reliance, and deep personal trust.

     3.     Defendant served as NYWB's Corporate Secretary and custodian of its corporate records, including its governing shareholder documents.

     4.     In June 2016, George and Defendant executed a Shareholders Agreement (the "Agreement") expressly designed to govern succession upon death. Among other things, the Agreement granted George's sons—Plaintiffs Spiro and Steven Menegatos—contractual rights to retain their father's shares upon George's death.

1

5.      After George died intestate on March 7, 2021, Defendant did not disclose the Shareholders Agreement. Instead, over the course of more than thirty months, Defendant repeatedly and affirmatively denied its existence—telling George's widow, Mary, the Estate's counsel, valuation professionals, the Company's accountant, and Plaintiff Steven Menegatos himself that NYWB operated only on a "handshake" basis.

6.      These statements were false. Defendant signed the Shareholders Agreement himself. He knew precisely where it was kept. He admitted that he saw the labeled envelope containing the Agreement each time he accessed the Company's corporate books.

7.      Defendant's concealment was purposeful. Had the Shareholders Agreement been disclosed, Plaintiffs would have exercised their contractual rights under Article 3 to retain and control their father's shares. By hiding the Agreement, Defendant ensured that the Estate administration and valuation proceeded on a false premise, depriving Plaintiffs of their succession rights and allowing Defendant to consolidate unilateral control of NYWB while marginalizing the Menegatos family.

8.      By the time the Agreement was finally presented to the Menegatos family, the Estate administration and valuation process had already been materially compromised. Plaintiffs' succession rights had been stripped away through deception.

9.      This action seeks to hold Stefanos accountable for that betrayal and the substantial damages it caused.

**PARTIES, JURISDICTION, AND VENUE**

10.      Plaintiffs Spiro Menegatos and Steven Menegatos are citizens of the State of New Jersey and reside in Bergen County, New Jersey.

11.      Defendant Stefanos Evangelinos is a citizen of the State of New York and resides in Queens County, New York.

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendant because Defendant resides in New York and the acts and omissions giving rise to Plaintiffs' claims occurred in New York, including within this District.

14.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendant's concealment of corporate records and related misrepresentations and communications made in and from Queens County and directed to professionals located in this District.

## STATEMENT OF FACTS

### I.    THE FAMILY PARTNERSHIP AND NYWB

#### A. The Business Relationship

15.     The Menegatos and Evangelinos families were intertwined for generations. Their relationship extended far beyond commerce and was marked by mutual reliance and deep personal trust.

16.     In 1981, George Menegatos and Nicholas Evangelinos purchased Bagel Buffet, a storefront bagel shop in New York's West Village. Within just two years, Bagel Buffet began selling their products at the wholesale level to other delis, restaurants, and breakfast carts. Soon after, George and Nicholas left Manhattan in search of a larger location from which to scale up their wholesaling operations. George found suitable quarters in Astoria, right on 36th Avenue and 31st Street. They named the new site New Yorker Bagels, Inc.

17.     As Nicholas' health failed, George took Nicholas' son, Defendant Stefanos Evangelinos, under his wing at a young age, allowing Stefanos to become a 50% shareholder of the newly formed New Yorker Bagels.

18.     Nicholas stepped out of an active role, and Stefanos watched and learned as George continued to push New Yorker bagels into every corner of New York City and beyond.

19.     In 1987, Stefanos joined the business full-time. When Nicholas retired, Stefanos became George's partner.

20.     In 1990, Stefanos was injured and unable to work for a year. Despite this, George continued Stefanos' salary without hesitation throughout Stefanos' recovery.

21.     On February 14, 1994, George and Stefanos incorporated New Yorker Wholesale Bagels, Inc. ("NYWB") as equal 50% shareholders. NYWB operates from 34-20 12th Street in Long Island City, Queens.

22.     NYWB produces approximately 100 million bagels annually. The company's 2025 gross sales are approaching $50 million.

### B. The Plaintiffs' Roles and Relationship with Stefanos

23.     As Nicholas wanted Stefanos to work in the family business, George likewise wanted his sons, Steven and Spiro, to do the same. Steven Menegatos worked at NYWB for more than twenty years, managing operations and participating in strategic decision-making.

24.     Steven worked very closely with Stefanos, who served as an older brother figure to him at NYWB. Over the years, Steven relied on Stefanos for guidance on critical business decisions, including operational strategies, financial management, and client relationships. The two collaborated on major business initiatives, and Stefanos regularly advised Steven on matters affecting the company. Their relationship was, therefore, not only personal, but also professional, involving a high degree of trust, confidence, and mutual dependence.

25.     Spiro Menegatos worked at NYWB part-time from his teenage years through college, returned in a management capacity from 2018–2020, and remained closely involved in NYWB's affairs.

26.     Spiro was godfather to Stefano's daughter, a role of significance in Greek Orthodox tradition, creating a spiritual and familial bond. This relationship fostered trust and confidence between Spiro and Stefanos, which extended to professional matters at NYWB.

27.     When Stefanos faced a DUI arrest, he called Spiro for assistance, reflecting a trust between them.  Defendant held himself out to Plaintiffs as an "older brother" and trusted advisor. Plaintiffs reasonably relied on Defendant for truthful disclosures regarding NYWB and their family's ownership interest.

28.     Over many years, Steven and Spiro relied on Stefanos for guidance in operational and strategic matters at NYWB. Stefanos had access to sensitive company information and exercised authority over decisions affecting the family's business interests. This combination of personal trust, professional reliance, and access to confidential information establishes a close fiduciary relationship between Stefanos and Plaintiffs.

**C. The June 2016 Shareholders Agreement Governing Succession**

29.     NYWB was not operated on informal or unwritten understandings. NYWB maintained corporate bylaws, share certificates, and a corporate book. NYWB also held shareholder meetings, which were documented and signed.

30.     Defendant served as NYWB's Corporate Secretary and was responsible for maintaining the NYWB's corporate books and records.

31.     In 2016, George and Stefanos negotiated and executed a Shareholders Agreement governing the disposition of shares upon either shareholder's death. The drafting extended over several months.

32.    Stefanos reviewed the Shareholders Agreement and discussed it with the Company's attorneys prior to execution.

33.    On June 29, 2016, George and Stefanos executed the Shareholders Agreement.

34.    The executed Shareholders Agreement was placed in a green and white envelope labeled "June 2016 Wholesale Agreement of Shareholders." The envelope was stored with NYWB's Corporate Book at NYWB's offices.

35.    Stefanos has provided conflicting accounts regarding the location of the Shareholders Agreement. At different times, he claimed the Agreement was maintained within the corporate book and, alternatively, that it was merely kept on top of the corporate book. When this discrepancy was raised, Stefanos minimized the inconsistency as a semantic distinction.

36.    Article 1 of the Agreement provided that "no sale, donation, pledge, hypothecation, encumbrance or other transfer of Shares shall be recognized or deemed effective unless the transferee shall execute and agree to be bound by this Agreement." Transfers not in compliance "shall be null and void."

37.    Article 3 permitted George to leave his shares to Steven and Spiro without triggering an option to purchase the decedent's share by Stefanos. If shares were left to Mary, the Agreement required they be held in a Qualified Subchapter S Trust with his sons, Steven Menegatos and Spiro Menegatos, acting as Trustees.

38.    Article 3 further provided that if George died intestate, Steven Menegatos and Spiro Menegatos shall have prior options to retain said shares in their individual capacities and as Trustees of the Marista Menegatos marital trust.

6

### D.  George's Final Instructions

39.     Approximately one year before his death, George called Steven and Spiro into his office. Stefanos was also present. George pointed to Stefanos and told his sons, in sum and substance, that they were to treat Stefanos as their older brother.

40.     At that time, George was talking to Stefanos as well, making clear that his sons, and the family's future in NYWB, were now in Stefanos's hands. George expected Stefanos to protect them, to be straight with them, and to honor the succession plan George had put in place—not to take advantage of their trust or their grief.

41.     George did not expect—and could not have expected—that Stefanos would hear that moment not as a charge to protect George's sons and honor George's plan, but as an opening and an opportunity to betray them.

## II.    GEORGE'S DEATH AND DEFENDANT'S CONCEALMENT

### A.  Immediate Aftermath

42.     George Menegatos died intestate on March 7, 2021.

43.     Defendant immediately assumed exclusive control over NYWB's operations.

44.     Although Spiro offered to help at NYWB following his father's passing, Defendant instructed Mary Menegatos not to permit Spiro to come to the business and positioned himself as Mary's sole point of contact for all things relating to NYWB.

45.     Stefanos provided Mary with contact information for various professionals after George's death but did not provide her the contact information for John Sotirakis, the attorney who drafted the Shareholders Agreement.

### B.  False Statements and Omissions

46.     From 2021 through 2023, Defendant repeatedly denied the existence of the Shareholders Agreement, including to: (1) Mary; (2) estate counsel (Dentons US LLP

("Dentons")); (3) valuation professionals (Sigma Valuation Consulting); and (4) Steven directly.

47.    Stefanos represented that NYWB operated solely on a "handshake basis."

48.    Stefanos knew these statements were false.

49.    On August 23, 2021, Mary was appointed Administrator of George's Estate by the Bergen County Surrogate's Court.

50.    Mary retained Dentons to assist with estate planning and administration.

### i. Statements to Dentons

51.    After Mary retained Dentons to administer the Estate, Stefanos invited Dentons to communicate with him directly concerning matters related to NYWB or any other of the entities that George and Stefanos jointly owned.

52.    Throughout the administration of the Estate, Dentons routinely asked Stefanos for information concerning NYWB, and Stefanos agreed to provide necessary and relevant information.

53.    Mary relied on Stefanos to advise her regarding NYWB matters. Stefanos was George's business partner, held the corporate records, knew the business inside and out, and was a close and trusted family member.

54.    Stefanos knew that Mary trusted and relied on him and that she would be easy to manipulate and would never challenge any of the decisions he made, sign any documents he provided to her, and believe any statements or representations that he made about the company.

55.    Stefanos communicated with Dentons on behalf of NYWB regarding all of the estate matters.

56.    When Dentons, in connection with Mary's administration of the Estate asked Stefanos for a copy of the Shareholders Agreement, Stefanos lied. He told them that there was no Shareholders Agreement and that everything with George was done "on a handshake."

57.     Stefanos' statements necessarily affected how the Estate was administered.

### ii.   Statements to Mary

58.     In a meeting with Dentons and Stefanos in the fall of 2021, during which Mary asked whether a shareholder's agreement existed, Stefanos stated that there was none and that the agreement was based solely on a handshake. The meeting took place via Zoom but Mary was at the time in person at the NYWB office with Stefanos when she asked him and when Stefanos made the representation.

### iii.   Statements to Steven

59.     While cleaning George's office after his death in the fall of 2021, Stefanos was reviewing the corporate book in Steven's presence and told Steven, as he held the corporate books in his hand, that there was no shareholders agreement.

60.     Stefanos then decided to embellish a bit, emphasizing the point, expressing "surprise" by stating something like "Damn, I can't believe we don't have a shareholders agreement."

### iv.   Statements to Sigma Valuation

61.     Sigma Valuation Consulting, Inc. ("Sigma'") was retained to value George's NYWB shares for estate tax purposes.

62.     Stefanos was the sole source of information provided to Sigma.

63.     In February 2022, Sigma requested copies of any operating agreement or buy-sell agreements relating to NYWB. Stefanos responded in writing: "We never did any."

64.     In March 2022, Sigma again requested operating agreements. Stefanos responded in writing: "we never did this."

### C.  Distorted Estate Valuation

65.     Stefanos was the sole source of information provided to Sigma. Stefanos personally prepared the responses to Sigma's questionnaire without consulting Mary.

66.    Stefanos provided Sigma with historical revenue figures that excluded cash distributions and cash payroll, understating the Company's actual revenues.

67.    Stefanos understood that the figures provided to Sigma understated NYWB's revenues.

68.    Sigma's valuation report stated: "According to Management, the Company does not have its own by-laws or shareholders' agreement." Stefanos reviewed the draft report before it was finalized and did not correct this statement, and the Sigma valuation report was conveyed to Spiro and Steven.

69.    Sigma valued George's 50% interest at $1,833,000. The Estate filed a federal estate tax return (Form 706) reporting George's 50% interest at $1,833,000 based on the Sigma valuation.

70.    Upon information and belief, the fair market value of George's 50% interest was between $10 million and $15 million. The Sigma valuation excluded NYWB's cash sales and did not adjust for non-arm's length transactions.

**D.  Events Following George's Death (2021–2023)**

71.    For more than two years after George's death, the Estate proceeded without knowledge of the Shareholders Agreement's existence.

72.    In the fall of 2021, there was a family meeting by and between Mary, Spiro, Steven, and Joy, Mary and George's daughter, that was held to address Stefanos' insistence that the Menegatos family designate a single representative to communicate with him regarding NYWB.

73.    At that time, no one in the Menegatos family was aware of any Shareholders Agreement, and Mary and Steven had been expressly told by Stefanos that none existed, leaving the family unaware of how George wanted his shares to be managed.

10

74.    Stefanos had wanted Mary to be the one. Mary had not previously participated in NYWB's management, and Stefanos knew that she was unfamiliar with NYWB's business, allowing Stefanos to exercise complete control over the Company' management and operations.

75.    At the time, Stefanos was a trusted older brother, someone who Spiro and Steven thought would watch out for the Menegatos family, and without knowledge about the Shareholder Agreement, which explicitly spelled out how George wants his shares managed after passing, the Menegatos family acceded to Stefanos' preference.

### E.  Exclusion of Plaintiffs from Governance and Decision-Making

76.    By January 2023, Defendant substantially reduced Steven's responsibilities at NYWB.

77.    Steven was excluded from strategic decision-making at NYWB despite his longstanding involvement in the business.

78.    Steven had no ownership interest reflected on the Company's books and no access to governing documents that would have protected his rights.

79.    Defendant's actions further consolidated unilateral control over NYWB.

## III.  THE "DISCOVERY" AND WEAPONIZATION OF THE SHAREHOLDERS AGREEMENT

### A.  The Truth Comes Out (October–November 2023)

80.    On October 27, 2023, Stefanos sent notes to NYWB's accountant, John Moraitis, and NYWB's counsel, John Pittas, proposing the creation of a "partnership agreement."

81.    Stefanos made no reference to the existing Shareholders Agreement.

82.    On November 2, 2023, a meeting was held at the law offices of John Sotirakis, lawyer for the company.

83.    Mary attended the meeting without independent counsel and without knowledge that a Shareholders Agreement existed and governed her late husband's testamentary wishes and her sons' rights.

84.    At that meeting, Stefanos claimed he had "recently found" the Shareholders Agreement, asserted that it was unexecuted, and stated he did not remember ever signing it.

85.    Those statements were false. Stefanos had executed the Agreement in June 2016 and had repeatedly seen it in NYWB's corporate records.

86.    Stefanos, Mary's trusted advisor, did not explain the Shareholders Agreement's significance to Mary, including especially Article 3, which granted Plaintiffs prior options to retain their father's shares.

**B.  Stefanos Encourages a Trust Transfer While Concealing His Intentions**

87.    On December 14, 2023, a meeting was held at NYWB with attendees including Mary; her counsel; Stefanos and his counsel, George Sitaras; Mary's three children; John Pittas; and John Moraitis.

88.    At that meeting, the parties discussed transferring the Menegatos' shares into a trust for the benefit of Mary's children in conjunction with preparing a new shareholders agreement.

89.    At the time, Stefanos expressed willingness to proceed with the contemplated share transfer, and in fact at the time seemed to have encouraged it. The parties also discussed executing a new Shareholders Agreement.

**C.  Stefanos Diverts NYWB Funds and Demands Blanket Release**

90.    Shortly afterwards, Stefanos began a campaign to loot the company, taking advantage of Mary's trust and also of the fact that neither Steven nor Spiro were allowed to participate in any aspect of corporate governance.

12

91.     On December 28, 2023, Stefanos induced Spiro, as Mary's proxy, to sign corporate resolutions that included a $600,000 payment directly to Stefanos.

92.     On January 1, 2024, Stefanos requested that Spiro execute a blanket waiver purporting to release and waive all claims relating to all prior dividends and distributions. The proposed document sought to ratify disputed payments and impose a sweeping release of liability for past actions. Spiro rejected the proposal as overly broad, one-sided, and potentially prejudicial, which raised concerns regarding the purpose and scope of the requested waiver.

93.     During this period, Stefanos caused NYWB to make payments to entities owned by his friends and family. Stefanos acknowledged that these payments had increased substantially since George's death but failed to explain their purpose.

94.     At the same time, Stefanos continued to operate NYWB without meaningful corporate controls— with a cash payroll, unreported cash sales, no audits or corporate formalities.

**D. Stefanos Attempts to Invoke the Agreement He Concealed**

95.     On February 5, 2024, Mary created the Marista Menegatos 2024 Stock Trust (the "Trust") for the benefit of Spiro, Steven, and Plaintiffs' sister, Joy Menegatos. The Trust was never funded and never owned any shares in NYWB.

96.     Mary, through counsel, made clear that she would transfer her NYWB shares into the Stock Trust *only* "in conjunction with finalizing the updated Shareholders Agreement."

97.     Once Stefanos stated that he had no intention of negotiating a new shareholders agreement, any transfer of shares into the Trust became impossible.

98.     On March 14, 2024—after encouraging discussions regarding the trust transfer—Stefanos sent Mary a Notice of Exercise of Purchase Option, asserting for the first time that discussions about the trust triggered his rights under Article 2 of the Shareholders Agreement.

99.     This was the Shareholders Agreement that Stefanos had hid from the Estate lawyers, the valuation company, Mary, Steven and Spiro, all in a brazen attempt to prevent them for learning about how George wanted his shares to be managed after his death, and all as part of a scheme to prevent Steven and Spiro from being able to exercise control over the affairs of NYWB.

100.    On March 15, 2024, Mary's counsel rejected Stefanos' purported Notice of Exercise in its entirety.

### E.  Stefanos' Final Consolidation of Control

101.    In June 2024, Stefanos terminated Steven, who had worked at NYWB for over 20 years.

102.    At the same time, Stefanos terminated Joy Menegatos, who worked as NYWB's Quality Assurance.

103.    With Steven and Joy removed from NYWB, Mary's status in question, and neither Spiro nor Steven holding the shares George intended them to receive, Stefanos effectively eliminated all Menegatos family oversight of NYWB and assumed unchecked control over NYWB's operations and finances, including the ability to direct corporate funds to related parties without supervision.

### <u>FIRST CAUSE OF ACTION</u>

### (Fraud)

104.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

105.    Defendant made repeated, material misrepresentations of fact and concealed material facts concerning the existence of NYWB's governing Shareholders Agreement and the rights it created for George's family upon his death.

106.    These misrepresentations and concealments were material because the existence (or nonexistence) of the Shareholders Agreement governed the Estate's administration of George's 50% ownership interest, Plaintiffs' succession rights, the timing and mechanics of any post-death options, and the valuation and disposition of George's shares.

107.    Defendant made false statements of material fact, including but not limited to: (a) stating to Mary in or about 2021 that there was no agreement in place and that partners operated on a "handshake basis"; (b) stating to Dentons in or about 2021 that there was no agreement in place and that partners operated on a "handshake basis"; (c) stating to Steven that there was no shareholders agreement; (d) stating to Sigma in writing on February 23, 2022 that there were no buy-sell agreements ; (e) stating to Sigma approximately one month later that "we never did this" in response to a request for operating agreements; (f) failing to correct the Sigma valuation report, which falsely stated that no shareholders agreement existed; and (g) providing financial information to Sigma that he knew understated the Company's revenue.

108.    Stefanos knew his statements were false when made. He personally signed the Shareholders Agreement himself and, in his role as the Corporate Secretary, was responsible for and maintained custody of NYWB's corporate records, placing the Shareholders Agreement within his knowledge, custody, and control.

109.    Stefanos' misrepresentations and concealment were deliberate and intentional. His purpose was to keep the Estate, Plaintiffs, and their advisors in the dark while Stefanos consolidated control of NYWB, influenced the estate administration process, preserved a path to force a buyout on terms favorable to him, and prevented Plaintiffs from exercising their options under the Shareholders Agreement.

110.    Stefanos knowingly made false statements to third parties, including Mary, Dentons and Sigma, while aware that  Plaintiffs were specifically named beneficiaries in

Article 3 of the Shareholders Agreement and that those statements would be relied upon in administering George's Estate and determining Plaintiffs' rights.

111.    Defendant knew and intended that his false statements to Mary, Dentons and Sigma would be communicated to Plaintiffs as beneficiaries of George's Estate and would influence their understanding of, and ability to protect their rights.

112.    Defendant made misrepresentations to Steven directly when Defendant claimed that the Shareholders Agreement did not exist and feigning surprise at its supposed absence.

113.    Plaintiffs justifiably relied on Defendant's misrepresentations and concealment. Defendant was not an arms-length third party; he was George's 50/50 partner, the person holding himself out as the point person for NYWB's corporate information, and the person George had instructed Plaintiffs to treat as an "older brother." In that posture, Defendant was uniquely positioned to be believed—and he exploited that trust.

114.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered and will continue to suffer damages including, without limitation: (a) lost opportunity to exercise their Article 3 prior options; (b) impairment or loss of contractual and property rights in George's NYWB ownership interest; (c)lost distributions; (d) tax exposure from the artificially depressed valuations; ; (e) denial of income and revenues from the NYWB ownership interest; (f) out-of-pocket losses and consequential damages; all in an amount to be proven at trial, but in no event less than $25,000,000, exclusive of interest, fees, and costs.

115.    Defendant's conduct was willful, malicious, and undertaken with a conscious disregard of Plaintiffs' rights, warranting an award of punitive damages sufficient to punish Defendant and deter similar misconduct.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

116.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

117.    After George's death, Defendant exercised de facto control over NYWB's operations, finances, records, and information flow, and held himself out as the point person for NYWB in connection with the Estate's administration and valuation.

118.    At all relevant times, Defendant owed fiduciary duties of loyalty, honesty, fair dealing, due care, and full disclosure to Plaintiffs as the intended and/or rightful successors to George's ownership interest, including duties arising from Defendant's status as a co-owner, officer (including Corporate Secretary with statutory duties under N.Y. Bus. Corp. Law § 624), custodian of corporate records, and controlling insider in a closely held company.

119.    Defendant also owed fiduciary duties directly to Plaintiffs arising from a decades-long relationship of trust between the Menegatos and Evangelinos families. Defendant held himself out as an "older brother" to Plaintiffs, cultivating a relationship in which Plaintiffs reasonably relied on him for truthful disclosures and fair dealing concerning their family's NYWB ownership interest.

120.    Defendant breached those fiduciary duties by, among other things: (a) concealing and withholding NYWB's Shareholders Agreement and other governing corporate records when asked for them; (b) misrepresenting to the Estate's counsel and valuation professionals that no shareholder agreement existed and that NYWB operated only on a "handshake" basis; (c) using his exclusive access to gatekeep information from the Estate, Plaintiffs, and their advisors; (d) allowing valuation work to proceed on a false premise and failing to correct known errors regarding the existence of the Shareholders Agreement; (e) providing understated financial information to Sigma while knowing it would be used to value

the company; (f) leveraging the resulting delay and confusion to solidify unilateral control over NYWB; and (g) manipulating the timing and circumstances of disclosure to maximize his own advantage and undermine Plaintiffs' rights.

121.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs have sustained damages in an amount to be proven at trial, but in no event less than $25,000,000, exclusive of interest, fees, and costs.

### THIRD CAUSE OF ACTION

### (Constructive Fraud)

122.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

123.    At all relevant times, Defendant stood in a fiduciary and confidential relationship with Plaintiffs arising from (a) his position as George's 50/50 business partner, NYWB officer and Corporate Secretary, and custodian of NYWB's books and records, (b) his de facto control of NYWB after George's death, and (c) the decades-long relationship of trust between the Menegatos and Evangelinos families, in which Defendant held himself out—and was held out by George—as an "older brother" to Plaintiffs.

124.    By virtue of that fiduciary and confidential relationship, Defendant owed Plaintiffs duties of candor, loyalty, fair dealing, due care, and full disclosure in connection with matters affecting Plaintiffs' rights and economic interests in George Menegatos's 50% ownership interest in NYWB, including the duty to disclose NYWB's governing documents and the truth concerning the existence and operation of the Shareholders Agreement and the post-death rights it created for Plaintiffs.

125.    Defendant violated those duties by making material misrepresentations of fact and by concealing and failing to disclose the existence of the Shareholders Agreement and its provisions governing the transfer and retention of George's shares upon his death.

18

126.   Specifically, Defendant stated to Dentons that no agreement existed and that he and George operated on a "handshake" basis; stated to Sigma in writing on February 23, 2022 that "we never did any" buy-sell agreements; stated to Sigma approximately one month later that "we never did this" in response to a request for operating agreements; failed to correct Sigma's valuation report which proceeded on the false premise that no shareholders agreement existed; and made similar misrepresentations and omissions to Plaintiffs and their agents, all while Defendant knew the Shareholders Agreement existed and that Plaintiffs were specifically named beneficiaries under Article 3.

127.   Defendant's misrepresentations and concealment were material because the existence and terms of the Shareholders Agreement governed and directly affected Plaintiffs' succession rights, the timing and mechanics of post-death options, the Estate's administration of George's shares, and the valuation and disposition of George's 50% ownership interest.

128.   Defendant made the foregoing misrepresentations and concealments for the purpose of inducing reliance by Plaintiffs and the Estate, and Defendant knew and intended that the Estate's professionals (including Dentons and Sigma) would rely on his statements in performing their work, that those statements and work product would be conveyed to Plaintiffs as beneficiaries, and that Plaintiffs would rely on them in deciding what action to take (or not take) regarding George's shares.

129.   Plaintiffs justifiably relied on Defendant's misrepresentations and concealment because Defendant occupied a position of trust and confidence, held the corporate office and control that placed the relevant information uniquely within his knowledge, and presented himself as the family's trusted "older brother" at the precise moment the family was grieving and dependent on him for truthful information.

130.   As a direct and proximate result of Defendant's constructive fraud, Plaintiffs suffered and will continue to suffer damages, including, without limitation: (a) loss of the

opportunity to timely exercise and enforce rights and protections intended for them under Article 3; (b) impairment or loss of property and economic interests associated with George Menegatos's NYWB ownership interest; (c)lost distributions and other ownership-related income and revenues, including salary, dividends, shareholder distributions, and profits; (d) out-of-pocket losses and consequential damages, all in an amount to be proven at trial, but in no event less than $25,000,000, exclusive of interest, fees, and costs.

131.    Defendant's conduct was inequitable, in bad faith, and in conscious disregard of Plaintiffs' rights, and entitles Plaintiffs to all legal and equitable relief available, including compensatory damages, pre- and post-judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

### FOURTH CAUSE OF ACTION

### (Accounting)

132.    Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if repeated and incorporated herein.

133.    Since George's death on March 7, 2021, Defendant, acting as NYWB's controlling shareholder and de facto operator, has had exclusive possession, custody, and control over NYWB's books, records, and financial information, and has exercised dominion over the Company's finances, cash flows, and distributions.

134.    Plaintiffs are entitled to an accounting of all assets, liabilities, income, expenses, distributions, and transactions involving NYWB from March 7, 2021 (the date of George's death) to the present, including but not limited to: (a) all cash revenues, whether reported or unreported, including cash payroll, and cash distributions; (b) all distributions, payments, compensation and other benefits paid to or for Defendant's benefit; (c) all related-party payments; and (d) all other corporate transactions in which Defendant engaged.

135.    An action at law for damages alone is inadequate because Stefanos occupies a fiduciary position, the parties stand in a confidential relationship, Stefanos has exercised exclusive control over NYWB's financial records, and the true nature and extent of the Company's finances and Defendant's self-dealing cannot be ascertained without equitable relief.

136.    Plaintiffs therefore demand that Stefanos render a full, complete, and verified accounting of all funds, distributions, and transactions affecting Plaintiffs' ownership interest in NYWB, and that judgment be entered against Defendant for all amounts found due and owing to Plaintiffs as a result of that accounting.

## FIFTH CAUSE OF ACTION

### (Tortious Interference with Prospective Economic Advantage)

137.    Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if repeated and incorporated herein.

138.    Plaintiffs had a reasonable expectation of continuing and future economic benefit arising from their family's 50% ownership interest in NYWB and from Plaintiffs' ongoing participation in NYWB's business, including the expectation of receiving ownership-related economic benefits such as dividends, shareholder distributions, profit allocations, and other revenues, as well as the expectation that Steven would continue to earn through his ongoing role at NYWB.

139.    Defendant knew of these expectations. Defendant worked alongside Plaintiffs for years, knew that George intended Plaintiffs to remain tied to NYWB and to receive the economic fruits of the family's ownership interest, and understood that, after George's death, Plaintiffs' financial future depended directly on NYWB's operations and distributions.

140.    Defendant intentionally interfered with Plaintiffs' prospective economic relationships and expectancies using wrongful and tortious means, including but not limited to:

(a) concealing and withholding NYWB's Shareholders Agreement and related corporate records; (b) affirmatively misrepresenting to estate counsel and valuation professionals that no shareholder agreement existed and that the business operated only on a "handshake" basis; (c) using his control over NYWB's records and information flow to deprive Plaintiffs of the information necessary to protect their economic interests; (d) leveraging the resulting delay to consolidate unilateral control and exclude Plaintiffs from participation; (e) terminating Steven's employment and cutting him off from compensation and future earnings; and (f) later invoking the Shareholders Agreement offensively to block the transfer of shares toward Plaintiffs and to position Defendant to acquire the Menegatos family's interest for himself at a depressed valuation.

141.    Defendant's wrongful means constituted fraud, misrepresentation, and concealment, which are independent torts and actionable as wrongful means for purposes of tortious interference. Defendant's conduct went beyond ordinary business self-interest and ordinary competition.

142.    Defendant acted with malice, intending to prevent Plaintiffs from exercising their rights under the Shareholders Agreement, exploiting their lack of knowledge, and consolidating control of NYWB for his own benefit. Defendant knew that his misrepresentations and concealment would induce Plaintiffs to rely on false information, and that Plaintiffs would be harmed economically as a result.

143.    As a direct and proximate result of Defendant's tortious interference with prospective economic advantage, Plaintiffs have sustained damages in an amount to be proven at trial but in no event less than $25,000,000, exclusive of interest, fees, and costs, together with such other and further relief as the Court deems just and proper.

144.    Defendant's conduct was willful, malicious, and undertaken with a conscious disregard of Plaintiffs' rights, warranting an award of punitive damages sufficient to punish Defendant and deter similar misconduct.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Stefanos Evangelinos as follows:

(a) awarding compensatory damages in an amount to be proven at trial, but in no event less than $25,000,000, exclusive of interest, fees, and costs;

(b) awarding punitive damages in an amount sufficient to punish Defendant and deter similar misconduct, to the extent permitted by law;

(c) ordering restitution and disgorgement of all benefits Defendant wrongfully obtained, and imposing a constructive trust over any such benefits and property interests to the extent traceable to George Menegatos's ownership interest in NYWB;

(d) directing a full and complete equitable accounting of NYWB's books, records, finances, and distributions from March 7, 2021 through the present, and awarding judgment for all amounts found due and owing to Plaintiffs as a result of that accounting;

(e) awarding pre- and post-judgment interest as allowed by law;

(f) awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees to the extent recoverable; and

(g) granting such other and further relief as the Court deems just and proper.


Dated: January 6, 2026
New York, New York                     Respectfully submitted,

                                       **DGW Kramer LLP**

                                       By: /s/ Jacob Chen
                                       Jacob Chen, Esq.
                                       45 Rockefeller Plaza, 20th Floor
                                       New York, New York, 10111
                                       E-mail: jchen@dgwllp.com
                                       *Attorneys for Plaintiffs*